UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MELVIN ALLEN,

          Petitioner,

v.

CHARLES SCHUYLER,

          Respondent.

Case No. 24-cv-00315-RFL (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.      INTRODUCTION

Petitioner Melvin Allen seeks federal habeas relief under 28 U.S.C. § 2254 from his California state conviction for murder.  Allen has not carried his burden to show he is actually innocent.  Nor has he shown error.  The prosecutor did not commit misconduct; trial counsel was not ineffective for failing to object; and the trial court's failure to instruct the jury regarding spectator misconduct did not deprive Allen of a constitutionally fair trial.  And, because there were no errors, there was no cumulative error.  The petition for habeas relief is DENIED.

## II.      BACKGROUND

In 2018, an Alameda County Superior Court jury found Allen guilty of first degree murder (Cal. Penal Code § 187) and found true an allegation that he personally and intentionally discharged a firearm in the commission of the offense (*id.* § 12022.53).  (State Appellate Opinion, Dkt. No. 15-13 at 3.)  A sentence of 50 years to life in state prison was imposed.  (*Id.*)  His attempts to overturn his conviction in state court were unsuccessful.  This federal habeas petition followed.

1

The facts of the crime were summarized by the state appellate court:

This case arises from the shooting death of Dominique Johnson on the night of December 23, 2017. At [Allen]'s trial, the following evidence was presented.

Oakland Police Officer Daniel Breznick testified that on December 23, 2017, around 10:25 p.m., he responded to a dispatch of a shooting on Brush Street between San Pablo and West Grand Avenues in Oakland. He was familiar with that area, where there is a freeway overpass, as well as a park and a tent encampment in the triangle made by the three streets. When Breznick arrived at the scene, there was a group of people standing over a person lying facedown in the street. The person, who was unresponsive and had no pulse, had a single gunshot wound to the center of his chest, with a possible exit wound on the right side. Breznick performed CPR on the person until paramedics arrived at the scene.

The parties stipulated that an autopsy of the victim, Dominique Johnson, revealed that the cause of death was a single gunshot wound to the chest, with an entrance wound mid-sternum and an exit wound on the right, lateral side of the back.

Oakland Police Sergeant Bradley Baker, a homicide detective who was assigned to investigate the shooting, testified that he was called to the scene on the night of December 23, 2017, where he observed an expended shell casing from a firearm, a black, hooded sweatshirt, a white T-shirt, and apparent blood spatter at several locations. The black sweatshirt was found at the corner of West Grand and Brush and the blood spatter was located mid-block on West Grand between San Pablo and Brush, moving along West Grand toward Brush Street.

Baker collected surveillance video footage from nearby businesses with cameras and found that two cameras had captured the shooting from different angles. Video footage from both cameras was played for the jury. Camera 2 showed the intersection of West Grand and Brush, as well as the park area. Camera 7 showed two figures in dark clothing walking from left to right, approximately 10:25 p.m. The black sweatshirt appeared on the street corner less than a minute later. It had been dropped by one of the two figures shown walking in the video.

Bonnie Cheng, an Oakland Police Department criminalist, testified as an expert in the field of comparing DNA samples. The crime lab processed the black sweatshirt related to the homicide of Johnson; samples taken from the front collar and left cuff were fully tested for DNA. Cheng determined that the two samples contained DNA mixtures of at least two individuals, including one major and one minor contributor on the front collar. Cheng conducted a statistical analysis of the DNA profile from the front collar and was able to determine that the major donor's profile would be expected to occur in the population approximately 'once in 2 nonillion' (i.e., 30 zeroes following a 2) individuals. The frequency of the DNA profile from the left cuff of the sweatshirt was '1 in 690 octillion' (i.e., nine

zeroes following 690). Cheng compared a DNA sample taken from [Allen] with the major donor from the front collar of the sweatshirt and found that his sample was consistent with the sweatshirt sample. Cheng was unable to obtain a full DNA profile of the minor donor.

These results indicated that [Allen] was most likely the 'habitual wearer' of the sweatshirt. There was, however, no way to determine if he was the last person to wear the sweatshirt before testing. The person who wears an article of clothing is more likely to leave more DNA on it than someone who merely handled it briefly. The DNA of Candace C. ([Allen]'s girlfriend) was not compared with any of the DNA found on the sweatshirt.

Andre S., who testified that he would not be in the courtroom if he were not under a court order to appear, had been part of the homeless community living near the scene of the shooting for about five years. Andre had 'heard of' a woman named Candace who hung around that area in December 2017. He did not know [Allen] personally, but had seen him around and heard him called Melvin. On the night of December 23, 2017, Andre was at a bus stop near the intersection of West Grand and San Pablo in Oakland. From the bus stop, he was only partially able to see the area of Brush and West Grand because there were bushes between him and that area. He noticed a lot of police activity in the area and learned that someone had been shot. Before the police arrived, he did not hear any yelling or arguing coming from the area of West Grand and Brush. He had seen [Allen] in the area earlier that day, but did not see him that night before the police showed up.

Andre acknowledged being interviewed at Santa Rita Jail by Sergeant Baker on February 1, 2018. After the prosecutor played portions of an audio recording of the interview, Andre acknowledged that even before Baker explained why he was there, Andre said, 'this must be about Melvin and what's her name.' He also acknowledged telling Baker that he was at the bus stop at San Pablo and West Grand when he heard and saw 'Mel and dude fighting.' He testified that he told Baker he had heard a sound that could have been either a shot or a car backfire. He acknowledged hearing himself say 'shot,' but not 'backfire,' in the recording of the interview played at trial.

Andre further testified that while he was at the bus stop that night, he heard voices, but he could not remember if the voices were raised in argument. He did not see any altercation from the bus stop because he was facing the wall with his back to San Pablo, receiving oral copulation. He further testified that he told Baker he heard a shot because he 'wanted to impress him' since he was in custody at the time. Baker did not offer him any leniency, however. When the prosecutor asked if he told Baker that when he heard the voices, 'Mel, [Candace], and dude were standing in the middle of the park on the West Grand side across from the storage building,' Andre responded, 'I don't remember my exact words, but I made up something that night to impress the officer . . . ' He no longer recalled if he told

Baker that those three people were the only ones he saw in the area.

After playing more of the audio recording of the February 1, 2018 interview with Baker, Andre acknowledged that he 'might have said' that he had known Mel for over a year. He also identified photos Baker had shown him as being of Mel and Candace. When shown a map on which someone had circled an area in 'the middle of the curb line at West Grand in front of the park,' Andre agreed that was where he had indicated to Baker that Mel, Candace, and the other man were standing when he saw them. Andre also acknowledged having an exchange during the interview in which Baker asked, 'Did she get mixed up with these two when they were beefing,' 'to which he responded, 'I don't know. Somebody said it might have been over her. I'm not sure. [¶] Question: Okay. But you didn't see her fighting with him or anything like that? [¶] Answer: No. [¶] Question: Did you see any punches throwing between them [*sic*] or anything like that? [¶] Answer: No.'

On cross-examination, Andre testified that people who live in tents in the area near where the shooting took place sometimes borrow or steal each other's clothing. He had heard rumors about the shooting, including that police were looking for witnesses, from late December 2017, until he went to jail in early 2018. That is why he assumed Baker had come to the jail to interview him about Mel and his girlfriend. The night after the shooting, when he was approached by an officer and asked about the incident, Andre said he did not see anything, which was the truth. He agreed that his motive in telling Baker about rumors he had heard about the killing was to give police the idea he knew something so that he could maybe make a deal to get out of jail sooner and to make him look good regarding his parole violation. Andre had previously testified under oath in this matter in April 2018, and had said he did not see any portion of the altercation. Other than hearing a backfire or a shot, he did not see anything connected with this case due to his back being to San Pablo.

Candace testified that on December 23, 2017, she was living in a tent in Oakland, in the area of West Grand, San Pablo, and Brush. Sometime before 10:00 p.m., just before she planned to leave for work, she was in the tent with her boyfriend, [Allen], when the tent shook. [Allen] looked out the window of the tent, saw someone leaving, and 'screamed, 'hey, who is that?' '[Allen] then left the tent and, after locking up the tent, Candace followed. When she caught up with [Allen] about a half block from the tent, on 23rd Street between Brush and West, [Allen] was '[e]xchanging words in a heated conversation,' apparently with the person who shook the tent. The two men agreed to fight, and [Allen] removed his jacket and handed it to Candace. The jacket did not have a hood and opened in the front. The fight lasted around three minutes and ended when the other man, who [Allen] had pinned to the ground, said, 'okay. I give,' and [Allen] let him get up. Candace did not see any punches thrown during the fight; it was '[m]ore of a wrestling match.' She knew that [Allen] had wrestled in high school. She believed she returned [Allen]'s jacket to him right after the fight.

Candace and [Allen] then started walking back to their tent. Candace glanced over her shoulder and saw that the man [Allen] had fought with was trailing them. When she told [Allen] that the man was following them, he turned around and faced the man. As the man continued to follow them, she saw [Allen] walk backwards from the corner of Brush into the park at West Grand and Brush. Meanwhile, Candace started walking back to the tent. She had reached the intersection of Brush and West Grand, about 40 feet away from [Allen], when she heard a gunshot, apparently coming from the park. She turned around and saw both [Allen] and the man in the park; they were about 15 feet apart. Candace saw the man turn around and start walking back toward where the fight had taken place near the intersection of 23rd and Brush. She could tell that he had been shot. Candace ran toward [Allen] and said, 'let's move out of the way. Let's get from right here.' They then left the area, walking up West Grand to Martin Luther King Jr. Way. [Allen] was walking faster than she was, so he got ahead of her, but she eventually caught up with him near the tent area. Lots of people surrounded them, asking if they knew what had happened, since they were coming from the direction of the gunshot.

Candace did not tell anyone anything. She and [Allen] never had a conversation about what had happened that night. Where Candace comes from, people do not discuss things like that. It is also frowned upon to talk to the police or testify in court, and people who do so are sometimes called a snitch. She recognized some of the people in the courtroom as being from the neighborhood. She knew the majority of them, a few of whom were associates of [Allen].

Candace acknowledged that she was interviewed by Sergeant Baker on April 1, 2018, at the Oakland Police Department. She testified that she was not sure if she told Baker that [Allen] had asked for his jacket as the victim approached because she was under the influence of heroin when she spoke to Baker and she was presently unclear as to exactly what she said that day. She had used heroin in the police department bathroom just before the interview with Baker.[1]

The prosecutor then played portions of a DVD of the April 1, 2018 police interview for the jury, and asked Candace questions related to each portion played. Candace acknowledged that in the interview, contrary to her trial testimony, she told Baker that [Allen] had said to her, 'give me my jacket. Give me my jacket' 'just before the shooting, and that, then, 'all of a sudden, he turned around and shot him.' 'In the interview, she had also responded twice in the negative when Baker asked if [Allen] had said anything before shooting Johnson.[2] Candace also

---

[1] Candace testified that she was not intoxicated during her testimony at trial. When the prosecutor noted she was having trouble staying awake, she said it was because she was a heroin addict, and she had last used heroin the night before.

[2] Specifically, the interview transcript reflects that Candace told Baker that

confirmed at trial that she reviewed a map during the police interview and had circled a portion of the map where she indicated that the shooting took place. Candace further confirmed at trial that Baker had shown her a photo of [Allen] during the interview and asked, 'is this the same guy that you'd seen shot [*sic*] Johnson here,' 'to which Candace had responded by nodding.[3]

Candace confirmed that at the end of the interview, after she had made all of the statements in the portions of the interview shown to the jury, Baker showed her the surveillance video from the night of the shooting. Candace testified that the location shown in the video appeared to be the park at West Grand and Brush. Candace recognized herself as one of two figures walking from left to right on the screen; she was the person on the left closest to the intersection and the other person, in darker clothing, was [Allen]. She testified that an exchange on the corner shown in the video was her giving [Allen] his jacket. Candace testified that a third person wearing a white shirt subsequently shown onscreen in the surveillance video was the person who was shot.

On cross-examination, Candace testified that her eyesight is bad and it is hard for her to see at night. In the area where the shooting occurred, some parts were dark and some were well lit. She also testified that she was nodding off at the start of the police interview with Baker because she was under the influence of heroin and because it was after 1:00 in the morning. She was also frightened to be there because Baker implied that she was involved somehow in the shooting. Candace had initially denied that she was present or had seen anything. Baker had then said he knew she was lying because the police had her on surveillance video, but she continued to deny being present, saying she was on a date. Candace testified on cross-examination that she only knew who was who on the surveillance video

---

[Allen] grabbed his 'coat' before rushing out of the tent after the victim had shaken it, and that he took off the jacket just before the initial fight with the victim and gave it to her to hold. Her statement is somewhat unclear about the exact timing of [Allen]'s request for the jacket. For example, she stated that when they got to the corner, [Allen] said, 'Give me my jacket—give me my jacket.' She gave the jacket back to him while they were still walking and the victim was following them. She said that after she gave [Allen] his jacket, he did not say anything to the victim before shooting him. However, just before they got to the location of the shooting, [Allen] asked the victim, 'Why you followin' me?'' The victim then said, ' 'Let's go again,''—meaning he wanted to fight again—and [Allen] said, 'You just asked to get up.' Candace further told the officers, 'So it was, like, yellin' and then—then the gunshot, uh—just everything just kinda, uh, that took place and everything just kinda chaotic right there . . . .' Candace believed the gun must have been wrapped up in [Allen]'s jacket, which was folded up while she was holding it for him. The hoodie that dropped on the ground at the corner also could have been wrapped up in [Allen]'s jacket.

[3] On cross-examination, Candace testified that she believed the nod she made at that point was "from the heroin use."

because Baker had told her.  She also denied that anyone in the audience in the courtroom had threatened her about testifying at trial or that anyone on the street had called her a snitch.[4]

On redirect examination, Candace acknowledged that after the lunch break that day, her testimony had 'started to deviate drastically' from what she had said to Baker during the police interview, but she denied that something had happened over the lunch break that made her want to tell a different story. Candace acknowledged that the officers did not show her the surveillance video until the very end of her interview.  When the prosecutor asked how she had 'describe[d] everything that was eventually shown in that video to happen before seeing the video,' Candace responded, 'Because that's what transpired.'  She also acknowledged that during the interview, every time the officers accused her of lying when she told them she was not present at the shooting scene, the officers were correct.

(Ans., State Appellate Opinion, Dkt. No. 15-13 at 3-12.)

As grounds for federal habeas relief, Allen claims (1) he is actually innocent; (2) trial counsel rendered ineffective assistance; (3) there was prosecutorial misconduct; (4) the trial court erred in failing to admonish the jury about spectator misconduct; and (5) there was cumulative

---

[4]    The following paragraph appears in the Westlaw version of the appellate opinion and in the Answer, but not in the official version filed in this suit:

The relevant surveillance video footage from Camera 7, played for the jury at trial, shows the following.  First, two people Candace had identified as her and appellant are visible walking in the street from left to right.  When they reach the sidewalk at the street corner, appellant reaches toward Candace as a man, identified as Johnson, comes into view, walking briskly towards them from the direction they had just come.  Approximately ten seconds after appellant first reaches for what appears to be a jacket that Candace has been holding, he turns and starts to walk down the adjacent sidewalk, with Johnson, who by now is just behind him, following.  After taking three or four steps, appellant turns around and walks backwards about six steps before stopping, dropping the jacket, raising his arm, and pointing at Johnson from close range.  Johnson immediately turns around and bends over before walking a number of feet with his hand over his chest, ultimately falling face down into the street.  Meanwhile, appellant has picked the jacket up off the ground and started walking away down the sidewalk, along with Candace, who had been standing in the street nearby since giving appellant the jacket.

*People v. Allen*, No. A155167, 2020 WL 3722944, at *5 (Cal. Ct. App. Jul 7, 2020).

error.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

### III.    DISCUSSION

#### A.    Actual Innocence

Allen claims he is entitled to habeas relief because he is actually innocent of the crimes. (Pet., Dkt. No. 1 at 7.)  His evidentiary basis for this claim is the October 13, 2020 declaration of alleged eyewitness Larry Greer.  (*Id.*, Dkt. No. 1-1 at 18-19.)  This declaration was emailed to Allen's appellate attorney Lauren Dodge by Allen's sister two years after the trial and three years after the murder.  (Ans., Dodge Decl., Dkt. No. 15-17 at 112.)  In his declaration, Greer describes a wrestling match between a man with dreadlocks (Johnson) and Allen, whom he referred to by the nickname Dago, though Allen's nickname is Melo:

> In the declaration, Greer recounts witnessing a late-night altercation between a man with dreadlocks and another man he referred to as 'Dago.'  He indicates that the man with the dreadlocks approached 'Dago' and threatened to kill him.  As the two men went to the ground in a wrestling match, Greer saw a gun in the pants of the man with the dreadlocks, and saw 'Dago' take the gun and put it in his own pants.  Greer noticed a woman he called 'Candence' watching the altercation from nearby.

(*Id.*, Whitney Decl., Dkt. No. 15-17 at 115.)  Greer "continued on his way" and "didn't see what happened next."  (*Id.*, Greer Decl., Dkt. No. 15-17 at 122-123.)

Allen's investigator, Scott Whitney, found Greer, who was "homeless and under the influence of narcotics," in late 2020.  (Ans., Dodge Decl., Dkt. No. 15-17 at 112.)  Greer "acknowledged having written and signed the declaration" but "he had difficulty recollecting the details of its contents."  (*Id.*)  Whitney tried to interview him again a few days later, but Greer said he was "drug sick" and could not talk.  (*Id.*)  Finally, Whitney tried to speak to Greer a third time at his tent, but Greer said "he could not talk because his wife was in the hospital."  (*Id.*)  Whitney's investigation was "discontinued after Whitney could not confirm the authenticity or contents of Greer's declaration due to Greer's homelessness and addiction."  (*Id.*)

A year and a half later, on May 9, 2022, a second declaration from Greer, also dated October 13, 2020, was delivered to Dodge.  "The declaration was near-identical in content to Greer's first declaration except it substituted the name 'Melo' for 'Dago.' "  (*Id.* at

113.) The declaration was also notarized, with a second signature from Greer dated on April 20, 2022. (*Id.*) Whitney interviewed Greer by phone around August 12, 2022. (*Id.*) "Now housed and sober, Mr. Greer confirmed to Whitney that he wrote the declaration, verified the truth of its contents, and explained how and why he had decided to come forward." (*Id.*)

Regarding the second declaration, Greer explained to Whitney that he thought he wrote the second statement a few months earlier:

> When it was explained to him that the second statement had the same date as the first statement he wrote, he could not explain why that would be. As to the change of name from 'Dago' to 'Melo', he stated that he did not know Melvin Allen well. They both lived in the same encampment so Larry would see him around occasionally. When he wrote the first statement he had it in his head that Melvin's street name was 'Dago.' So that is the name he used in the initial declaration. When he was talking to Alysia, she used the name Melvin and that is when Larry realized that the person he was calling 'Dago' in the declaration was actually 'Melo.' In his mind they were one and the same person.

(*Id.*, Whitney Decl., Dkt. No. 15-17 at 117-118.)

"When asked if he was promised anything in exchange for writing the declaration he stated, 'No, I wish.' " (*Id.* at 118.) Greer said that he "came forward to write the statement because he saw what happened and feels it is the right thing to do. He added that he saw a true crime show once that was similar in that a person came forward after a man was convicted to tell what they saw and helped the man overturn his conviction." (*Id.*)

"'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "Actual innocence" is established when, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner]," *id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)), or that "every juror would have voted to acquit him," *Lee v. Lampert*, 653 F.3d 929, 946 (9th Cir. 2011) (citing *Schlup*, 513 U.S. at 327) (Kozinski, J. concurring). A petitioner can make a showing of "actual innocence" by presenting the court with new evidence which raises a sufficient doubt as "to undermine confidence in the result of the trial." *Schlup*, 513 U.S. at 324. *Schlup* requires a petitioner "to support his allegations of constitutional error with new reliable evidence—whether

it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggen v. Perkins*, 569 U.S. 383, 399 (2013).

It is difficult to meet the *Schlup* standard. Affidavits from three witnesses indicating that a person other than petitioner committed the murder were insufficient to meet the actual innocence standard because such evidence had been available during the time of trial and was "dubious." *McQuiggen*, 569 U.S. at 389-390. Expert opinion evidence concerning the reliability of some of the trial testimony, a police report about another man molesting the victim, and evidence regarding two witnesses was insufficient to show that petitioner was innocent of the crime of child molestation. *Lee*, 653 F.3d at 943-45. An accomplice's recantations of his statements to police that the petitioner killed the victim found insufficient to show "that every reasonable juror would find it more likely than not that [accomplice] Edmonds, at long last, has decided to tell the truth." *Smith v. Baldwin*, 510 F.3d 1127, 1141-42 (9th Cir. 2007).

Also, freestanding claims of actual innocence are not cognizable on federal habeas review. A federal habeas petitioner must tie his actual innocence claim to a constitutional error in the underlying criminal proceedings. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "[S]uch evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317 (1963).

Allen raised his actual innocence claim to the state supreme court by way of a habeas petition, which was summarily denied. (Pet., Dkt. No. 1-1 at 2; Dkt. No. 1-4 at 2.) When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state-

11

court decision is objectively unreasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not de novo. "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Habeas relief is not warranted here. As an initial matter, Allen's actual innocence claim is freestanding and therefore not cognizable on federal habeas review. He fails to tie his newly discovered evidence to a constitutional violation occurring in the state criminal proceedings. *Herrera*, 506 U.S. at 400.

Moreover, Greer's declaration is not sufficiently reliable. It appeared quite late — three years after the murder and two years after the trial. His explanation that he came forward with this information because it was the right thing to do does not explain the years of delay. Furthermore, when Whitney first questioned Greer, Greer "had difficulty recollecting the details of its contents," and he repeatedly declined to discuss the issue, possibly because of his drug addiction. Though Greer later affirmed, when sober and clear-headed, the correctness of his recollection, he still could not explain why the declaration, which he stated was written in 2022, was dated with an October 2020 date. The declaration therefore does not qualify as "new reliable evidence" such as a "trustworthy eyewitness account." *Schlup*, 513 U.S. at 324.[5]

In addition, Greer's declaration does not make it "more likely than not that no reasonable juror would have convicted" Allen of first degree murder. *Id.* at 327-28. In closing argument, the prosecution argued premeditation and deliberation based on the surveillance video and Candace's testimony, showing that Allen looked back and forth, asked for his jacket containing the concealed gun, and then kept the gun concealed until the moment of the shooting. (Dkt. No. 15-9, at 17-18.) Greer's declaration does not contradict that theory. Greer did not witness the shooting. According to Greer, Allen took the gun from Johnson and put the weapon in his own

---

[5]     Allen's request for an evidentiary hearing regarding his claim of actual innocence is DENIED because he has not met *Schlup*'s requirement to present the court with "new evidence which raises a sufficient doubt as to undermine confidence in the result of the trial." 513 U.S. at 324.

pants, at which point Greer walked away and did not see what happened next.  Greer's account is therefore consistent with Allen moving the gun to his jacket prior to the shooting, keeping it concealed, and shooting Johnson after he knew Johnson no longer posed a threat.  Nor does Greer's account support imperfect self-defense or heat of passion, for the same reasons.  In sum, Allen has not met the burden required to show actual innocence.  In its independent review, the Court concludes that the state court's denial of Allen's claim was objectively reasonable and is entitled to AEDPA deference.  This claim is DENIED.

### B.    Ineffective Assistance of Counsel

Allen alleges that trial counsel rendered ineffective assistance by failing to (a) investigate exculpatory witnesses; and (b) object to the prosecutor's alleged misconduct during closing argument.  (Pet., Dkt. No. 1 at 7; Dkt. No. 1-1 at 30-34, 67-93.)  Allen presented these claims on collateral, not direct, review.  Accordingly, the last reasoned decision is that of the state superior court on his habeas petition.

To prevail on a claim of ineffectiveness of counsel, a petitioner must establish that (1) counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984), and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.  When the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable."  *Harrington v. Richter*, 562 U.S. 86, 112 (citing *Strickland*, 466 U.S. at 693).

The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so."  *Richter*, 562 U.S. at 105 (quotation marks and citations omitted).  "The question [under § 2254(d) ] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied

*Strickland*'s deferential standard." *Id.*

### 1.    Investigation of Witnesses

According to trial counsel, "Allen was quite adamant that he was not present at the scene of the shooting, and did not want me to pursue theories of voluntary manslaughter based on heat of passion or imperfect self-defense." (Pet., Bryden Declaration, Dkt. No. 1-2 at 4.)  Despite this, Allen alleges that trial counsel David Bryden should have investigated and obtained statements from witnesses he contends would have provided evidence to support a self-defense argument, or would have led the jury to believe he was guilty of voluntary manslaughter based on a heat of passion or based on an imperfect self-defense theory.  (Pet., Petition to the California Supreme Court, Dkt. No. 1-1 at 30-33, 67-85.)  Allen concedes his "insistence of pursuing a defense that he was not present and did not commit the shooting," but contends that nonetheless "his counsel still had a duty to investigate these witnesses so that he could accurately and fully counsel petitioner about his defense."  (*Id.* at 33.)

The witnesses Allen believes should have been interviewed were Kenneth Marbley, Aiello Delane, and Christine Miller.  Marbley, whose nickname is Seakou, had been interviewed by policeman Sergeant Baker:

> On January 12, 2018, Sergeant Baker recorded a telephone interview with Kenneth Marbley, who was at the Qilombo on the night of the shooting. The Qilombo is self-described as a 'revolutionary social center' and is located on San Pablo Avenue across from where the shooting occurred.  As Marbley was leaving the Qilombo that evening, he observed his friend Johnson and another man fighting in the street.  As Marbley got closer, the larger man let Johnson up and he heard Johnson say, 'check my fade, check my fade again.'  The other man said, 'No leave me alone, leave me alone.'  Marbley's friend also witnessed the fight and its aftermath, and Marbley told Baker, 'He heard [Johnson] say, um, 'catch my fade, catch my fade.'  And he heard dude say, 'Back up or I'm gonna pop you, back up or I'm gonna pop you.'  You know what I mean.  That's when we heard the gun.  I personally didn't hear that.'

(Pet., Superior Court Order Denying Petition, Dkt. No. 1-3 at 147-148.)  Marbley "was upset that I had called him and asked how I found his phone number."  (*Id.*, Oakland Police Department Interview, Dkt. No. 1-2 at 39.)  He stated he "hates the police, specifically the Oakland police."

(*Id.*)  "I asked Marbley if he would look at some photos to help identify the suspect.  Marbley refused, the interview was concluded."  (*Id.* at 40.)

Miller, who had had a child with Johnson, was also interviewed by Sergeant Baker:

Miller sent a text message to Baker which relayed a conversation with Aiello Delane, who had been at the Qilombo the night of the shooting.  The text stated that while Delane was inside the club, '[Marbley] came in and told him [Johnson] was outside fighting and they needed to break it up.  That's when they heard him following the man saying 'tryna catch my fade' and the man responded 'I'm gonna shoot you' and [Johnson] repeated it, and the man repeated his self again.  And then couple seconds after that he shot him.'

(Pet., Superior Court Order Denying Petition, Dkt. No. 1-3 at 148.)  Miller said Marbley (Seakou) had told her that he had seen Johnson fighting with Allen; that Johnson had followed Allen and wanted to fight with him again; and that Allen turned around shot Johnson.  (Ans., Dkt. No. 14-1 at 24.)

Bryden was appointed on March 20, 2018, to represent Allen.  (Pet., Bryden Decl., Dkt. No. 1-2 at 4.)  On April 23, his request for funds to hire an investigator was approved, but on May 25, Allen rescinded his time waiver, and on July 9, the jury trial commenced.  (*Id.*)  The investigator Bryden had hired, Charlotte Webb, had been unable to find Candace or any other potential witness.  (*Id.*)  Bryden did not ask Webb to contact Marbley, Miller or Delane.  (*Id.*)  Though he does not remember why, he said he was focused on finding Candace.  (*Id.*)  He also said that after Allen rescinded his time waiver, there was not much time to conduct an investigation.  (*Id.*)

The state superior court rejected Allen's ineffective assistance claim.  First, Allen had not shown that "had Bryden conducted an investigation to Petitioner's liking, he would have been able to find these witnesses in the first place."  (Pet., Superior Court Order Denying Petition, Dkt. No. 1-3 at 165.)  An investigator's declaration noted that "Delane no longer lived at his last known address, and that Marbley relocated to the Stockton area and his last known phone number went straight to a busy signal, suggesting it had been disconnected."  (*Id.*)  Second, Allen had not established that these witnesses, if they could have been found, "were willing and able to

testify had they been contacted by trial counsel," much less that "they would have provided any favorable information." (*Id.*) "All anybody knows about what these witnesses said is relayed through intermediaries, and are thus subject to distortion via the passage of time, memory, and interpretation. Had these witnesses been contacted, there is a chance they might have denied making the statements at all, or may have materially altered what was previously reported to have been said." (*Id.*) Third, even if the witnesses had been located and were willing to testify, questions of credibility and the witnesses' ability to perceive the events remain. (*Id.*) Fourth, even if the court assumed that the "investigation would have uncovered evidence that Petitioner warned Johnson that he was going to shoot him prior to shooting him, it is doubtful that evidence would have countered the evidence of premeditation and deliberation":

> A person who warns someone that they are about to commit murder is not somehow automatically absolved of premeditation and deliberation in the commission thereof. It is unclear how this would have bolstered the scant evidence, if any, that Petitioner acted in the heat of passion. Given all of the evidence, it would also do little to support a claim of self-defense, imperfect or otherwise. Again, there was not even a hint that Johnson was in possession of a weapon throughout the encounter, including when Johnson approached Petitioner again, when Petitioner pointed a gun at him, or when Petitioner then shot him in the chest at close range. Considering this evidence, that Petitioner warned Johnson before shooting him would do little to support a finding that he actually feared that Johnson posed an imminent danger to life or great bodily injury that must instantly be instantly dealt with. It would not dispense with the evidence of planning activity and would not significantly alter the manner of killing.

(*Id.* at 166.)

Federal habeas relief is not warranted on this claim. Allen has not shown that Bryden's performance was deficient. Bryden's investigation was reasonable in light of the information about those witnesses and what they knew. He reviewed the police recordings of the witnesses, and his investigator searched for but could not locate any potential witnesses. Also, to prevail on an ineffective assistance claim based on a failure to investigate a witness, a petitioner must show that the witness would have testified for the defense at trial. *Allen v. Woodford*, 395 F.3d 979, 1002 n.2 (9th Cir. 2005); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000). Allen has not met

his burden to make that showing.  Also, Marbley said he did not want to be involved and that he hated the police.  Delane, who was the only person who heard Allen warn Johnson that he was going to shoot him, could not be located and never gave a statement to police or investigators.

Furthermore, it would have been odd and damaging to introduce evidence of self-defense in the face of Allen's insistence on pursing a defense that he was not present and did not commit the shooting.  *See Greenway v. Ryan*, 856 F.3d 676, 682 (9th Cir. 2017) (presenting a mental state "defense would have been counterproductive.  Had counsel argued that Greenway acted impulsively, counsel would have placed Greenway at the scene of the crimes and negated the defense that he had not participated in the murders, a defense consistent with the physical evidence.")  Also, the jury could have seen Allen's warning Johnson that he would shoot him as further evidence of premeditation and deliberation.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 562 U.S. at 108.  In light of these concerns, Bryden's decision not to pursue or present such evidence was entirely reasonable.

Allen also has not shown prejudice.  Marbley's statements do not significantly change the factual record.  He did not hear Allen threaten to shoot Johnson, but rather repeated what his friend allegedly heard.  Also, it is doubtful that Allen's proposed evidence would have countered the evidence of premeditation and deliberation or established a credible self-defense argument.  There is no evidence that Johnson posed a threat to Allen.  He was not armed, and Allen had bested him in a physical fight.  The jury saw recordings of Allen shooting Johnson, and of the time before and after the shooting, and also heard the testimony of Candace and Andre.  Also, again, evidence of self-defense would place Allen at the scene and responsible for the shooting and therefore would have contradicted his insistence that he was not at the scene and did not shoot Johnson.  On such a record, the state court's rejection of Allen's claim of ineffective assistance for failing to investigate was reasonable, and is entitled to AEDPA deference.  This claim is DENIED.

### 2.    Failure to Object to Closing Argument

Allen claims that trial counsel rendered ineffective assistance by failing to object to the prosecutor's alleged misconduct during closing argument.  (Pet., Dkt. No. 1 ay 7.)  As explained below, the prosecutor did not commit misconduct.  Because there was no misconduct, it would have been pointless to offer an objection.  It is both reasonable and not prejudicial for defense counsel to forgo a meritless objection.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).  The state court's rejection of Allen's claim of ineffective assistance for failing to object was reasonable, and is entitled to AEDPA deference.  This claim is DENIED.

### C.    Prosecutorial Misconduct

Allen claims the prosecutor committed misconduct in his closing argument.  (Pet., Dkt. No. 1 at 7; Dkt. No. 1-1 at 34-37; 94-104.)  According to Allen, the prosecutor contended that Allen failed to warn Johnson and that he had concealed the gun, though the prosecutor knew or had reason to know this was false because of the information provided by Candace, Miller, and Marbley.  (*Id.*, Dkt. No. 1-1 at 34-36.)  The state superior court summarized the facts as follows:

> Here, Petitioner argues that the prosecutor's theory of intent to kill and premeditation and deliberation was based on Candace's recorded pretrial statement played for the jury that Petitioner 'kept the gun concealed' and that Petitioner failed to warn Johnson before shooting him.  By arguing that Petitioner was silent before the shooting and intentionally concealed the gun, Petitioner claims, the prosecutor misrepresented the evidence by failing to reference Candace's statements during that same interview that there was "yellin' " just before the shooting.  [¶]  Petitioner further asserts that the prosecutor was also aware of other witnesses who heard Petitioner, prior to shooting Johnson, warn Johnson that he was armed and would shoot if Johnson did not back off.
>
> . . . .
>
> At trial, Candace testified that . . . she was twice asked whether Petitioner said anything before shooting Johnson, and that both times she said that Petitioner did not say anything.  As Respondent persuasively argues in the informal response, a further examination of this transcript indicates that Candace's statement that there was "yellin' " prior to the gunshot appears to refer to yelling that occurred after the fight between Petitioner and Johnson, rather than yelling that occurred just prior to the shooting.

(Pet., Dkt. No. 1-3 at 147, 151.)

Allen's claim of prosecutorial misconduct was rejected by the state courts. The superior court concluded that "Candace's statement remains the most reliable evidence," while the information provided by Miller and Marbley was lacking and unreliable:

> Nor can it be held that the evidence concerning Marbley and Miller at least gave the prosecutor a very strong reason to doubt Candace's statement. Aside from Petitioner and Johnson, Candace was the closest witness to the murder. She observed the entirety of the event, and her account was largely corroborated by surveillance video. When the prosecutor asked how she had 'describe[d] everything that was eventually shown in that video to happen before seeing the video,' Candace responded, 'Because that's what transpired.' It cannot be held that a prosecutor must be restrained from arguing a fact from Candace's statement because there are a couple of vague multiple-hearsay statements from other uninvestigated purported witnesses that were disclosed to the defense and not introduced at trial.

(*Id.* at 155, 156.) Furthermore, there was no prejudice. Candace's statements were corroborated by other evidence and the superior court found it "difficult to imagine a different result should the jury, evidentiary issues aside, were to somehow hear that someone told Marbley that he heard Petitioner warn Johnson before shooting him, though Marbley did not hear that himself, or that Delane spoke to Miller who then texted Baker that Delane heard Petitioner say, 'I'm gonna shoot you,' prior to shooting." (*Id.* at 156-157.)

A defendant's due process rights are violated when a prosecutor's comments during closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation omitted). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

Habeas relief is not warranted here because the state courts reasonably determined that the prosecutor did not make any improper or intentionally false comments. The prosecutor's comments were based on the statements and testimony of the best surviving witness to the events, Candace, who stated that Allen did not say anything to Johnson before shooting him. The statements from the other witnesses were far too unreliable to plausibly contend that the

prosecutor knew or had reason to know that his arguments were false. Furthermore, there was no prejudice. That Allen may have told Johnson that he would shoot him does not negate a finding of premeditation or deliberation. It could in fact show premeditation and deliberation. The state court's rejection of Allen's claim of prosecutorial misconduct was reasonable, and is entitled to AEDPA deference. This claim is DENIED.

### D.    Spectator Misconduct

Allen claims that the trial court's failure to admonish the jury about pervasive spectator misconduct deprived him of his due process rights to a fair trial. (Pet., Dkt. No. 1 at 8; Dkt. No. 1-4 at 15-16, 41-45.) Allen claims that "[d]uring key testimony, numerous audience members used threatening facial expressions and gestures to intimidate witnesses and jurors, prompting the court to suspend proceedings three times." (*Id.*, Dkt. 1-4 at 41.) He notes that one juror (Juror No. 35) was excused because she feared for her safety after recognizing two spectators she thought were looking at her. (*Id.*) Allen also asserts that "[t]wo other jurors reported they were inclined to believe [Candace's] incriminatory out-of-court statements in lieu of her testimony because she had been influenced by the spectator threats." (*Id.*) As explained below, this claim is both (1) procedurally defaulted, and (2) without merit.

The state appellate court, on direct review, summarized the facts:

At trial, Candace's testimony differed in some ways from her statements during her police interview with Baker. She claimed at trial that she did not remember the details of the interview because she was under the influence of heroin at the time and that, where she comes from, it is frowned upon to talk to the police or testify in court and that people who do so can be called a snitch. She further testified that she recognized some of the people in the courtroom as being from the neighborhood and that she knew the majority of the people in the audience, a few of whom were associates of appellant.

Over the course of the trial, the court responded to three instances of spectator misconduct. During each episode, the court spoke to the audience in the courtroom outside the presence of the jury.

First, just after Officer Breznick finished testifying, the court excused the jurors for their morning recess. The court then asked counsel to stay in the courtroom while it addressed the people in the audience. The court proceeded to tell

appellant's sister what it said had already been pointed out to "everyone else, that you can't have any kind of communication whatsoever during court with the defendant. Not suggesting that you did; I'm just giving you the rules of the court. The law doesn't allow anyone to communicate with anybody in custody, that means no waving, no verbal or nonverbal communication." The court then addressed the relatives of the victim who were in the courtroom, expressing condolences, but also stating that "this is [the] time and place to allow the criminal justice system to do what it does. And so, just need cool heads, you know, and can't have any kind of outburst in the courtroom . . . I can't allow that."

Second, during the direct examination of Andre, the court asked the jury and Andre to leave the courtroom and again addressed the audience. The court stated: "You cannot continue [to] walk in and out, sit down willy-nilly. It's distracting to the court. And if it's distracting to me, it could be distracting to this witness, because I don't know what your relationships are with one another, but I do know that this man is going to testify with the ability of this jury to listen objectively to what he has to say. And if you are distracting from the proceedings on this side of the bench, then you are going to leave . . . I don't want to see you communicating with each other. I don't want to see you talking to one another. This is not musical chairs in this courtroom. And if you cannot do that, get out."

Third, just after the start of the direct examination of Candace, the court directed Candace and the jury to briefly leave the courtroom. It then asked a member of the audience who she was and the audience member said she was Candace's sister. The court asked whether something was said to her while Candace was testifying, and she responded that appellant's sister had looked at her and she looked back at appellant's sister, who then asked "who I was looking at." The court ordered appellant's sister out of the courtroom. The court again admonished the rest of the audience that if anyone could not conduct themselves in an orderly manner, they would be told to leave. It also stated: "It's important for the fairness of this process that this jury not see or hear anything that anyone may personally think or believe about the proceedings."

The prosecutor then made the request that, "besides the people here associated with the victim or in support of [Candace], I would ask that everyone else be moved to the defendant's side of the audience" because "there's a direct line of sight to the witness stand from this side of the courtroom. I believe there's been a lot of misconduct that the court has already commented on going on directly in her line of sight." The court followed the prosecutor's suggestion and told people associated with the victim or Candace to sit on one side of the courtroom and people associated with appellant to sit on the other side.

(Ans., State Appellate Opinion, Dkt. No. 15-13 at 32-34.)

Juror No. 35 told the court during a telephone call that she was concerned for her and her mother's safety. (*Id.* at 34.) She had recognized in the courtroom two men, both associated

with Allen.  (*Id.*)  The men lived near the area of the killing, which was near her mother's residence and near Juror No. 35's hairdresser.  (*Id.*)  She feared "repercussions."  (*Id.*)  The court excused Juror No. 35 for good cause and replaced her with an alternate juror.  (*Id.* at 35.)

### 1.    Procedural Default

 Respondent contends that Allen's claim is procedurally defaulted.  On direct appeal, the state appellate court, citing *People v. Hill*, 3 Cal. 4th 959, 1000 (Cal. 1992), determined that Allen had forfeited his claim that the trial court failed to admonish the jury because his attorney had not made a contemporaneous objection and then asked for a curative instruction.  (Ans., State Appellate Opinion, Dkt. No. 15-13 at 39.)  Because the state supreme court summarily denied review, it is presumed that it also imposed the same procedural bar.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W]here, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.")

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The state carries the initial burden of adequately pleading "the existence of an independent and adequate state procedural ground as an affirmative defense."  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  If the state meets this requirement, the burden then shifts to the petitioner "to place that defense in issue," which the petitioner may do "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."  *Id.*

As respondent points out, Allen's claim is procedurally defaulted because he did not raise a contemporaneous objection.  Federal courts have recognized that California's contemporaneous objection rule constitutes a valid basis for procedural default.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1256-57 (9th Cir. 2011).  Respondent having met its burden, it is now Allen's burden to place the defense in issue by demonstrating the inadequacy of the state

procedure.  The only discussion of procedural default appears in his Traverse:

> Respondent argues, without citation to authority, that petitioner's spectator misconduct claim is procedurally defaulted because the state court determined that the failure to object and request an admonishment in the trial court barred him from raising the issue on appeal.  Answer at p. 34.  This is incorrect, as the state Court of Appeal considered the issue on the merits on grounds that counsel rendered ineffective assistance of counsel under the Sixth Amendment for failing to object or request an admonishment.

(Traverse, Dkt. No. 21 at 20-21.)  None of this suffices to place the defense at issue.  The state appellate court did declare that Allen had forfeited his spectator misconduct claim.  That it ruled on the merits of another claim is irrelevant to showing the inadequacy of the state rule.  Respondent therefore has shown that the claim is procedurally defaulted.

To overcome a claim of procedural default, a petitioner must establish either (1) cause for the default, and prejudice, or (2) that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice."  *Harris v. Reed*, 489 U.S. 255, 262 (1989).  To show cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  For cause to exist, the external impediment must have prevented the petitioner from raising the claim.  *See McClesky v. Zant*, 499 U.S. 467, 497 (1991).  To show prejudice, a petitioner bears "the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension."  *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).  If the petitioner fails to show cause, the Court need not consider whether the petitioner suffered actual prejudice.  *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).  To show a "fundamental miscarriage of justice," a petitioner must show that the constitutional error of which he complains "has probably resulted in the conviction of one who is actually innocent."  *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing Murray, 477 U.S. at 496).

The above passage from the Traverse, which is Allen's only substantive discussion of procedural default, does not show cause for the default or prejudice. Nor has Allen shown that a failure to consider the claim will result in a fundamental miscarriage of justice. Furthermore, the Court has already determined that he has not made a showing of actual innocence. This claim is DENIED as procedurally defaulted.

### 2.    Merits

Even if the claim were not procedurally defaulted, it would fail on the merits. A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* Furthermore, the omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell*, 850 F.2d 470, 475 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Thus, a petitioner whose claim involves a failure to give a particular instruction, as opposed to an instruction that misstated the law, bears an "especially heavy burden." *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

Habeas relief is not warranted here. The trial court instructed the jury that it could base its verdict only on the evidence presented at trial. A jury is presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Allen's declaration regarding the jurors' thought processes is not admissible. Federal Rule of Evidence 606(b) prohibits the use of juror testimony to impeach a verdict when that testimony relates to intrinsic matters, *i.e.*, the internal, mental processes by which the verdict was rendered. *Tanner v. United States*, 483 U.S. 107, 116-127 (1987). This leaves the evidence of glares and gestures. The glares and gestures were insufficient to show that Allen was deprived of a fair trial, especially in light of Candace's original statements to the police (which were closer in time to the incident) and the extent to which those statements matched the surveillance footage that she had not yet seen. This claim is DENIED on the additional ground that it lacks merit.

### E.    Cumulative Error

Allen claims that the cumulation of the prosecutor's and trial counsel's errors so infected the trial that he was denied his due process right to a fair trial. (Pet., Dkt. No. 1 at 7-8; Dkt. No. 1-1 at 37-39; 104-106.)  This claim was rejected by the state appellate court: "Considering our resolution of the issues raised on appeal, we find that none of the alleged errors, whether alone or in combination, prejudiced him.  Accordingly, there is no ground for reversal based on cumulative error." (Ans., State Appellate Opinion, Dkt. No. 15-13 at 45.)  Allen also raised a cumulative error claim in habeas petitions to the state appellate and supreme courts, which summarily denied review. (Ans., Dkt. No. 13; Dkt. 1-4 at 2.)

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003).  Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (overruled on other grounds).

Habeas relief is not warranted here.  There has been no showing that the combined effect of alleged errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). As discussed above, Allen's claims of prosecutorial misconduct, ineffective assistance, and the trial court's failing to issue an instruction lacked merit.  Because there were no errors, there were no errors to accumulate to infect the trial with unfairness.  The state court's rejection of this claim was reasonable and is therefore entitled to AEDPA deference.  This claim is DENIED.

### CONCLUSION

The state court's adjudication of Allen's claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Allen may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The Clerk shall enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

**Dated:** October 2, 2025

RITA F. LIN
United States District Judge